CITRONELLE–MOBILE GATHERING, INC., Robert T. Dalton and Harold Enke, Plaintiffs,

v.

McLUCAS, John L., Adm., FAA: Coleman, William, Adm., Department of Transportation, Defendants.

Civ. A. No. 75–584–P.

United States District Court, S. D. Alabama, S. D.

May 5, 1977.

---

Lester M. Bridgeman and Jeffrey M. Lang, Washington, D.C., G. Sage Lyons and Cooper C. Thurber, Mobile, Ala., for plaintiffs.

Edward J. Vulevich, Jr., Asst. U.S. Atty., Mobile, Ala., Joan Truitt and Sandra Dawahare, Office of Chief Counsel, FAA, Washington, D.C., for defendants.

## OPINION AND ORDER

PITTMAN, Chief Judge.

This is an action by Citronelle-Mobile Gathering, Inc. (Citmoco), which owns and operates a Sabreliner 60 jet aircraft powered by two Pratt & Whitney JT–12A jet engines, and by Robert T. Dalton and Harold Enke, licensed pilots and employees of Citmoco, who pilot the aircraft.

The plaintiffs seek to permanently enjoin the Secretary of Transportation, William Coleman, and the Administrator of the Federal Aviation Administration (FAA), John L. McLucas, from enforcing against plaintiffs an FAA regulation (Special Federal Aviation Regulation 27 (SFAR–27)), as amended (the amendment), and as applicable to Pratt & Whitney JT–12A class jet engines, for that (a) it is *ultra vires* in that it seeks to enforce a regulation issued by the Environmental Protection Agency (EPA) under the Clean Air Act to bar fuel emissions into the atmosphere during ground and flight operations but it actually applies only to aircraft fuel emissions onto the ground after ground and flight operations have terminated; (b) it is unenforceable because the amendment was issued by the FAA without complying with the statutory condition precedent that EPA must first publish comments on the environmental impact, including the safety of persons and property, of the proposed regulation; and, (c) it is arbitrary and capricious because the amendment issued by FAA (1) was without consideration or investigation of, or findings with respect to, safety hazards repeatedly brought to the attention of FAA; and (2) because compliance with the amendment would force plaintiffs to violate other regulations promulgated by FAA re-

lating to safety, and would not in any event, significantly affect air pollution resulting from fuel emissions.

Another Judge of this court (Hand, J.) entered a temporary restraining order against the defendants on December 5, 1975, and granted a preliminary injunction after hearing.

Defendants contend that (a) this court lacks jurisdiction of the subject matter of this action, and, (b) that the FAA's decisions as to the safety of the suggested technical means of compliance with the EPA standards as found in the amendment were not arbitrary, capricious, an abuse of discretion or otherwise a violation of law.

By order of this court (Hand, J.) it was determined that " . . . the court has jurisdiction over the subject matter of the action as it relates to the said defendants [McLucas and Coleman] . . . ." (see Order on defendants' McLucas and Coleman motion to dismiss, Doc. No. 23.).

This action arises under the laws of the United States. The amount in controversy, exclusive of interest and costs, is more than $10,000.00. Jurisdiction is conferred upon this court by 28 U.S.C. §§ 1331, 1332, and 5 U.S.C. § 706. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202.

The findings of fact and conclusions of law are limited to the amendment as applicable to Pratt & Whitney JT–12A class jet engines.

### FINDINGS OF FACT

Plaintiff Citmoco is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Mobile, Alabama.

Citmoco owns a Sabreliner 60 aircraft, United States Registration No. N1MN, equipped with two Pratt & Whitney Model JT–12A jet turbine engines.

Plaintiff Harold E. Enke resides in Mobile, Alabama, and is employed by the plaintiff Citmoco as a pilot of the described aircraft. Enke holds Commercial License No. 1882026 issued September 9, 1974, and Flight Instructor's License No. 1882026–CFI issued June 23, 1975, by the FAA.

Plaintiff Robert T. Dalton resides in Mobile, Alabama, and at all pertinent times was employed by Citmoco as a pilot of the aircraft. Dalton holds Airline Transport License No. 1625391 issued by FAA in 1972 and Flight Instructor's License No. 1625391–CFI issued by FAA in 1966. Dalton has terminated his employment with Citmoco.

Defendant John T. McLucas was at the time of the filing of this action the Administrator of the FAA, which is part of the United States Department of Transportation.

Defendant William Coleman was at the time of filing of this action the Secretary of the Department of Transportation.

The Clean Air Act Amendments of 1970, 42 U.S.C. § 1857, *et seq.*, established in § 1857f–9, standards to prevent "fuel venting emissions" from being "discharged into the atmosphere", "from any class or classes of aircraft or aircraft engines which in his [the EPA Administrator] judgment cause or contribute to or are likely to cause or contribute to air pollution which endangers the public health and welfare," and defined those emissions as "raw fuel . . . discharged . . . during all ground and flight operations." 40 CFR §§ 87.1(a)(26), 87.10, 87.11.

Pursuant to § 231 of the Clean Air Act, 42 U.S.C. § 1857f–9, the EPA published the required report "Aircraft Emission: Impact on Air Quality and Feasibility of Control" and issued for public comment a notice of proposed rulemaking on December 12, 1972 (37 Fed.Reg. 26488).[1] Public hearings were held in Boston, Massachusetts, on January 29, 1973, and in Los Angeles, California, on

---

1. The report defines ground and flight operations as follows:

"Flight operations include the approach and climbout modes as well as landing and take off, even though the latter occur partially on the ground. Ground operations include the taxi and idle modes of the cycle." p. 71

February 6, 1973. A final regulation was published by EPA on July 17, 1973, 38 Fed. Reg. 19088, 40 CFR §§ 87.10, 87.11, "Engine Fuel Venting Emissions (New and In-Use Aircraft Gas Turbine Engines.)."

Prior to the EPA hearings in Boston and in Los Angeles, the FAA made available a comprehensive "Tentative FAA Regulatory Draft re: EPA Proposed Aircraft Emission Standards," for public review and comment, 38 Fed.Reg. 1949, on January 19, 1973, so that interested parties would be on notice of FAA's proposed methods for compliance with the EPA proposal.

Pursuant to § 232 of the Clean Air Act, the Administrator of the FAA by delegation from the Secretary of Transportation, 49 CFR § 1.47(g), published a Notice of Proposed Rule Making on June 27, 1974, 39 Fed.Reg. 30272 for public comment.

The Administrator of the FAA by delegation from the Secretary of Transportation published SFAR–27, 14 CFR Part 11, as originally proposed on December 28, 1973.

In February, 1974, after FAA issued SFAR–27, the EPA amended 40 CFR § 87.-11 by adding to the provisions of sub-paragraph (a) prohibiting fuel venting emissions into the atmosphere from gas turbine engines, the following sentence:

"This paragraph is directed at the elimination of intentional discharge to the atmosphere of fuel drained from fuel nozzle manifolds after engines are shut down. . . . ."

EPA did not, however, change the definition of "fuel venting emissions."

On June 27, 1974, the Administrator of the FAA published a Notice of Proposed Rule Making, 30 Fed.Reg. 23271, which was to be the amendment under consideration, to include "Class T1" aircraft turbofan or turbojet engines of rated power less than 8,000 pounds thrust. The NPRM was open for comments from interested parties for 30 days.

On December 30, 1974, the Administrator of the FAA published the amendment to SFAR 27, 39 Fed.Reg. 45008, which set January 1, 1975, (later extended to September 1, 1975) as the effective compliance date for Class T1 category turbojet engines.

Citmoco advised the FAA that it would not comply with the amendment on the ground that compliance would create hazards to the safety of persons and property. Without compliance, Citmoco's Sabreliner 60 will lose its airworthiness certificate and the individual plaintiffs will be in jeopardy of having their pilots' licenses suspended or revoked.

The only EPA comment made pursuant to § 42 U.S.C. § 1857h–7 [2] and pertinent to fuel venting, is the November 27, 1973, letter from Mr. Stork to Mr. Skully of the FAA (Defendants' Exhibit No. 5). It is evident that EPA considered the amendment proposals unsatisfactory from the standpoint of achieving the desired "environmental impact." No effort was made to consider "damage to or deterioration of property, and hazards to transportation as well as effects on economic values and in personal comfort and well being" that might result from the enforcement of the amendment.

There was no referral to the Council on Environmental Quality.

---

2. 42 U.S.C. § 1857h–7 requires the EPA Administrator to:

"Comment in writing on the environmental impact of any matter relating to duties and responsibilities granted pursuant to this chapter . . . contained in any . . .
 (3) proposed regulations published by a department or agency of the Federal Government. Such written comment shall be made public at the conclusion of any such review."
Further:
"In the event the Administrator [of the EPA] determines that any such regulation is unsat-

isfactory from the standpoint of the public health or welfare or environmental quality he shall publish his determination and the matter shall be referred to the Council on Environmental Quality." 42 U.S.C. § 1857h–7(b).
42 U.S.C. § 1857h(h) states:
"All language referring to effects on welfare includes, but is not limited to, effects on soil, water, crops, vegetation, manmade materials, . . . damage to and deterioration of property, and hazards to transportation as well as effects on economic values and on personal comfort and well-being."

SFAR–27 as originally promulgated and later the amendment under consideration, barred fuel venting emissions by gas turbine engines and provided that an acceptable means of compliance would include techniques:

"Applied to the air frame or the engine that prevents the intentional discharge of fuel from nozzle manifolds after the engines are shut down. Acceptable means of compliance include the following:

(1) Incorporation of an FAA approved system that recirculates the fuel back into the fuel system.

(2) Capping or securing the pressurization and drain valve.

(3) Manually draining the fuel from a holding tank into a container."

There are presently two modes of compliance with the requirements of the amendment. One is the P & D valve plug. The P & D valve is a product of the post World War II jet engine industry. In the early jet engines there was no means of draining raw fuel remaining in the fuel manifolds after engine shut down. When these early engines were "stopcocked"[3] the residual raw fuel drained into the combustion and turbine sections of the engines.[4] When the raw jet fuel came into contact with the hot turbine parts an "after light" occurred, emitting sheets of flame out the tail pipe and in some cases out of the engine inlet. This phenomenon sometimes took place anywhere from one to three minutes after complete shut down. "After light" could and did cause damage to plane and ground crew and did extensive damage to engine parts. Subsequently, the air industry developed the P & D valve system.[5] The P & D valve is designed to open at engine shutdown and allow the excess raw fuel remaining in the fuel manifolds to drain onto the ramp.

In the big commercial jet engines the quantity of fuel drained was substantial.[6] As a result of massive adverse publicity, engine manufacturers and the airline industry in the early 1970's built "catch tanks" for the fuel to drain into. These "catch tanks" for the most part incorporated a system of vent lines which carried the excess fuel into the catch tank and then used ram air to vent the fuel into the atmosphere after takeoff. The end result was that the fuel, in one form or another, was released into the atmosphere.

Prior to the recent refinements to both the fuel nozzles and the raw jet fuel, the P & D valve further served the purpose of preventing coking of the fuel nozzles and "hot starts." "A "hot start" occurs when, during the start up procedure, engine temperatures reach approximately 510 F or above, which leads to destruction of engine parts.

As an additional method of coping with the problem of excess fuel buildup in the combustion chambers a "flapper valve" was placed in the aft portion of the combustion case. This valve is completely controlled by pressure and is usually activated anywhere from a few seconds to a few minutes after "shutdown." In order for the "flapper valve" to be completely effective the engine should be in a tilted position in order for gravity to pull the excess raw fuel through the aft portion of the combustion case. It is clear that if the engine is not at the proper angle, the "flapper valve" will be of no use in purging the combustion chamber and/or case of the excess raw fuel.

With the P & D valve plugged, the excess raw fuel which is trapped in the fuel manifolds after the engine is "stopcocked" can only go out the nozzles and into the combustion chamber. In the JT–12A engines this occurs only after shutdown. As the JT–12A engine compressor "spools" down,

---

**3.** Stopcocking is the process of turning off the fuel flow by use of the cockpit power lever.

**4.** See Plaintiffs' Exhibits 3, 4 and 5.

**5.** See Plaintiffs' Exhibit No. 5.

**6.** See Plaintiffs' Exhibit No. 7 which is a letter to Mr. Herman Dugo from Norman Shutler, Director—Mobile Source Enforcement Division —EPA, where in he cites a study which estimated that 110 *tons of castoff jet fuel were dumped into the air surrounding Washington's National Airport in 1970.*

the temperature in the combustion case and chambers rises temporarily and reaches a temperature of approximately 800°F.

On "quick turn arounds" when the engine is shutdown and then, shortly thereafter, restarted,[7] there is a good likelihood of a "hot start" or an "after light" with the P & D valve plugged. With the accumulation of raw fuel in the combustion chamber this fuel will either be ignited or will be forced out into the atmosphere in the form of vapor and exhaust.

An alternate means of compliance different from the one in controversy here has been certified by the FAA. This is a drain can which attaches to the airframe. (See 14 CFR 11, SFAR–27, § 14(3)). The can collects fuel which drains from the engine through a hose link-up. At appropriate intervals, the can is manually drained and the waste fuel is dumped into an appropriate collecting basin. Thus, instead of being drained out the P & D valve directly onto the ramp, the excess raw fuel is collected in a catch tank to be dumped later. It is uncontroverted that there is no specific place in which to dump excess raw fuel at the airports the plaintiffs normally use, Houston, New York, Palm Beach, or Washington International.

There is a very small amount of fuel which accumulates in the JT–12A engines after shutdown, to wit, two ounces to five ounces, or less, per engine. This is vented through the "flapper valve" or is discharged into the atmosphere when "motoring" the engine on start up. By plugging the P & D valve the safest method of venting the excess raw fuel is preempted. The plugging has the potential of leading to unsafe conditions, i. e. "after lights" and "hot starts."

It is clear that the FAA was fully apprised of the safety hazards that were presented with the P & D valve plugged on JT–12A engines. (See Plaintiffs' Exhibits 6, 7, 8, 9, 10, 11, 13, 14 and 16.) The testimony of plaintiffs' expert, Mr. Dugo, a man with more than 30 years in the jet engine industry, many of which were spent working on Pratt & Whitney engines (see Plaintiffs' Exhibit 2), leads this court to interpret his numerous warnings to both the EPA and the FAA as being more than unsubstantiated "rumors."

The JT–12A engine was not tested. Larger jet engines such as used on the scheduled commercial airliners with similar drainage systems were tested. There were complaints about safety problems concerning the FAA requirements on the larger jet engines for a period of approximately one and one-half years. The documented tests run by the FAA (see Data Report No. 88 attached to Doc. No. 54) concerning the plugging of the P & D valve on the large jets plus the numerous complaints made to the FAA when the amendment was promulgated requiring the plugging of the P & D valve in the smaller JT–12A jet engines without testing, points up the arbitrariness of the Agency's action in this case.

The vast majority of civil non-commercial aircraft operated in the United States are propeller driven aircraft and are, as such, entirely unaffected by the amendment. The evidence shows that it is a normal procedure to drain quantities of fuel on the ground from fuel tanks without any FAA bar. In fact, FAA encourages aircraft users to drain fuel from fuel tank sumps in order to insure that the tanks are free of water.[8] No where has it been shown that there is any prohibition from dropping these quantities of far more volatile fuel on the ground.

To comply with the amendment an aircraft owner must either plug the P & D valve or install a "catch can" to gather the raw fuel which accumulates.

There are approximately 200 aircraft in the United States which have the JT–12A jet engines. These are generally privately owned, executive aircraft of limited use as

---

7. An example of this would be when plaintiffs are flying from Mobile to New York and have to stop in Nashville to pick up another passenger.

8. See Plaintiffs' Exhibit No. 1. The testimony indicates there are approximately 10,000 to 15,000 propeller aircraft in the U.S.

contrasted to the commercial carriers using the large jet engines.

The amount of jet fuel, two to five ounces, per engine per flight dumped on the ground or into the atmosphere is negligible.

The lack of investigation of serious problems raised by the application of the amendment to the small JT–12A engines is inexcusable. It is a horrible example of bureaucracy extending its regulations to a different situation without any known weighing of probable disadvantages against possible advantages.

■ This court finds the amendment to SFAR–27 as promulgated by the FAA and as applied by the FAA to JT–12A engines is arbitrary and capricious.

### CONCLUSIONS OF LAW

This court has jurisdiction of this cause pursuant to 28 U.S.C. § 1331, 1332 and 5 U.S.C. § 706.

Declaratory and injunctive relief is based on 28 U.S.C. § 2201–2202.

Venue is properly in this District pursuant to 28 U.S.C. § 1391(e).

■ The scope of judicial review of the FAA's actions concerning the amendment to SFAR–27 is whether the action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A), *Carlisle Paper Co. v. NLRB,* 398 F.2d 1, 6 (3rd Cir. 1968). A decision is arbitrary and capricious only where it is not supportable on any rational basis. *Estep v. U. S.,* 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); *Dickinson v. U. S.,* 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953).

The safety determination of the means of compliance with the requirements of the amendment is a matter left to the FAA. 42 U.S.C. § 1857f–10.

The FAA is the agency designated by Congress with ensuing aviation safety. 42 U.S.C. § 1857f–9(c); Clean Air Act Amendments of 1970, 42 U.S.C. § 1857f–10; § 307(c), 313(c), 313(a), 601 and 603 of the FAA Act of 1958, 49 U.S.C. §§ 1348(c),

1354(a), 1421 and 1423; and § 6(c) of the Department of Transportation Act. 49 U.S.C. § 1655(c), 49 U.S.C. § 1421, and § 1655. "[T]he court must give due deference to the agency's ability to rely on its own developed expertise." *Ethyl Corp. v. EPA,* 541 F.2d 1 (D.C.Cir. 1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The FAA's decisions are presumed valid but subject to judicial reversal if found to be arbitrary, capricious or an abuse of discretion. *Ethyl v. EPA, supra.*

As stated in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):

> "Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'
>
> ". . . To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." [Citations omitted]. 401 U.S. at 416, 91 S.Ct. 824, 28 L.Ed.2d at 153.

The FAA is under a statutory duty to assure safety in air operation and to make, or to require others to make, tests with respect to the safety of aircraft engines or appliances. 49 U.S.C. § 1421(a) and § 1423. The only recorded test by the FAA concerning the plugging of the P & D valve was on large jet engines (see Data Report No. 88 attached to Doc. No. 54) and none on the small JT–12A engine. The test results showing the possible link between the plugging of the P & D valve and "after lights" and "hot starts" combined with the numerous complaints passed on to the FAA by Mr. Dugo and others in the aviation community should have spurred the FAA to make an investigation into the propriety of applying by amendment SFAR–27 to JT–12A engines.

Inasmuch as FAA made no tests concerning the plugging of the P & D valve in the

JT–12A engines, made no provision for receptacles for emptying catch cans (human nature is such that is more likely than not that the catch cans would be dumped behind the corner of the first building or place out of ready sight), the exceptionally small amount of jet fuel involved, dangers pointed out by competent JT–12A jet engine engineers, the failure to test the result of plugging the small JT–12A jet engine, and the apparent failure to balance the small amount (two to five ounces) against the much larger quantities dumped by propeller aircraft, leads this court to the inescapable conclusion that the amendment as applied to the JT–12A engine is an arbitrary and capricious act on the part of the FAA.

This court fails to see how a regulatory agency which depended on the industry which it regulates for its only data[9] to determine that a technique as applied to JT–12A engines is safe can be termed anything but arbitrary, capricious and without any rational relationship to its intended purpose.

It is evident the FAA has failed to take a "hard look"[10] at the problem that the regulation was supposed to cure and at the safety problem created by its application to the JT–12A engines. Therefore, this court must intervene to rectify this "arbitrary and capricious" act of the FAA. 5 U.S.C. § 706(2)(A).

It is therefore ORDERED, ADJUDGED, and DECREED that the defendants herein and each of them, their agents, successors, deputies, servants and employees, and all persons acting by, through or under them, or any of them or by or through their order be, and are hereby, permanently ENJOINED from (a) taking any action whatever to suspend or revoke or seek to suspend or revoke the licenses issued by the Federal Aviation Administration and now held by plaintiffs Robert T. Dalton and Harold E. Enke, or the airworthiness certificate of Sabreliner 60 Aircraft Registration No. N1MN for the asserted reason or on the asserted grounds that the said aircraft was being operated in alleged violation of Special Federal Aviation Regulation 27 *as amended* or that the individual plaintiffs jointly or severally are operating, have operated or intend to operate said aircraft while it is in alleged violation of Special Federal Aviation Regulation 27 *as amended;* and (b) from applying or enforcing Special Federal Aviation Regulation 27 *as amended* against the individual plaintiffs jointly or severally in connection with the operation of its Sabreliner 60 Aircraft or aircrafts propelled by two model JT–12A jet turbine engines.

The Clerk of this Court is hereby instructed to forthwith serve copies of this order on all defendants.

Costs are taxed against the defendants.

---

**9.** On August 6, 1975, the FAA's Engineering and Manufacturing Branch Chief sent a letter to Pratt & Whitney which raised specific safety problems. It requested the company to make an investigation into its own engine to determine whether or not such problems did exist. Within a few days Pratt & Whitney prepared and forwarded a three page equivocal reply which did not state that an investigation had been made but simply denied the existence of the problem. (See Plaintiffs' Exhibits Nos. 14 and 15.)

**10.** See *Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375 at 394 (1973); *Greater Boston Television Corporation v. F.C.C.,* 143 U.S.App.D.C. 383, 444 F.2d 841, at 851 (1970).